56

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ORIGINAL

Ex. A

Eddie Joe Lloyd and Tia Terese Glenn,

        Plaintiffs,

        v.

City of Detroit, a Municipal Corporation,
County of Wayne, a Sub Unit of Government
Officer Thomas DeGalan, Officer Sylvia
Milliner, Officer William Rice, Sergeant
Kenneth Day, Supervisor John Roes, Detroit
Psychiatric Institute, Dr. Kyung Seok Han,
Barbara Beacon, MSW, Estate of William
Hart, Former Chief of Police, Deputy Chief
Richard Dungy, Gilbert R. Hill, Former
Officer in Charge of Homicide, Lt. Robert
L. Deane,

        Defendants,

_____/

Case No. 04-70922

U.S. District Judge Gerald E. Rosen

U.S. Magistrate Judge Pepe



## PLAINTIFFS' MOTION TO FILE AMENDED COMPLAINT

Now come the Plaintiffs, by and through counsel, and respectfully move for leave to amend the

complaint as set forth in the Proposed Amended Complaint, attached to this motion as Exhibit A.

Plaintiffs have sought but have not received concurrence from all counsel pursuant to LR 7.1 (a) (1). In

support of this motion, plaintiffs state as follows:

1.    On September 22, 2004, Plaintiff Eddie Joe Lloyd died of medical complications he incurred

during his wrongful incarceration, which is the subject of Plaintiff's originally filed lawsuit, March 4,

1

2004.

2.    On December 8, 2004, Ruth Harlin, the sister of the deceased Plaintiff, was duly appointed the Personal Representative of his estate in the Wayne County Probate Court.

3.    The Personal Representative is required under authority of the Estates and Protected Individuals Code to protect assets of the estate and pursue a cause of action in the interest of the estate and those claiming under the Act.

4.    Thus, the proposed amended complaint substitutes Ruth Harlin, as the representative of Mr. Lloyd's complaint, for Mr. Lloyd.  Ms. Tia Glenn remains as a plaintiff to pursue her own § 1983 claim in this case.

5.    Further, the proposed amended complaint includes a claim for the wrongful death of Mr. Lloyd. This claim could not have been pursued before Mr. Lloyd's death in September 2004.

6.    The proposed amended complaint also complies with the Court's June 25, 2004 and October 15, 2004 orders dismissing certain claims against certain defendants.

7.    Finally, the proposed amended complaint clarifies the Plaintiffs' Fourteenth Amendment claim against the Detroit Psychiatric Institute defendants to delineate the procedural and substantive due process claim against these defendants.  Based on precisely the same set of facts plaintiffs are pleading a related legal theory that is timely and adds no new defendants.

8.    There is no prejudice to these defendants by the addition of this legal theory.  These defendants have not filed any dispositive motions, have not yet taken the depositions of the plaintiffs and can still obtain any discovery they deem pertinent to this claim.

9.    Plaintiffs submit that Rule 15(a) of the Federal Rules of Civil Procedures directs that "leave shall

2

be freely given when justice so requires." Fed. R. Civ. P. 15(a); see also Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299, 306 (6th Cir. 2000).

10.   In this case, the proposed amendments are necessary due to Mr. Lloyd's death and to clarify the claims brought by Mr. Lloyd's estate and daughter. There are no new facts alleged, other than Mr. Lloyd's death, no new defendants are added, and the new claims are timely.

11.   Further, as discovery is proceeding, the deadline for making dispositive motions has not passed, the parties have adequate time to prepare for the amendment, to the extent any additional preparation is necessary. Thus, there is no prejudice to any of the defendants by allowing the proposed amendments.

12.   Motions to amend should be denied only when there is undue delay, bad faith, undue prejudice to the opposing party, or futility. See Troxel Mfg. Co. v. Schwinn Bicycle Co., 489 F.2d 968, 970 (6th Cir. 1973) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)), cert. denied, 416 U.S. 939 (1974)). None of these factors exist here, as the delay in adding the new claim is not "undue", there is no bad faith on the part of the plaintiffs, no party can show it will suffer prejudice as a result of the motion, and the amendments are not futile.

13.   In sum, plaintiffs' amendments are timely, meritorious and not filed for improper purpose. Further, defendants are not prejudiced by these amendments. Justice requires this Court to grant leave to amend.

WHEREFORE, the Plaintiffs' hereby pray this Court grant the Plaintiffs' motion to amend the complaint.

Dated: April 5, 2005

3

Respectfully Submitted,

**DAVID A. ROBINSON  P38754**
*DAVID A. ROBINSON & ASSOCIATES, P.C.*
Attorneys for Plaintiffs
28145 Greenfield, Rd., Ste. 100
Southfield, Michigan 48076
(248) 423-7234

**BARRY C. SCHECK**
**NICK BRUSTIN**
**ARCHANA PRAKASH**
Cochran Neufeld & Scheck
Attorneys for Plaintiffs
99 Hudson St. 8th Fl.
New York, NY 10013
(212) 965-9081

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Eddie Joe Lloyd and Tia Terese Glenn,

      Plaintiffs,

v.

City of Detroit, a Municipal Corporation,
County of Wayne, a Sub Unit of Government
Officer Thomas DeGalan, Officer Sylvia
Milliner, Officer William Rice, Sergeant
Kenneth Day, Supervisor John Rocs, Detroit
Psychiatric Institute, Dr. Kyung Scok Han,
Barbara Beacon, MSW, Estate of William
Hart, Former Chief of Police, Deputy Chief
Richard Dungy, Gilbert R. Hill, Former
Officer in Charge of Homicide, Lt. Robert
L. Deane,

      Defendants,

_____/

Case No. 04-70922

U.S. District Judge Gerald E. Rosen

U.S. Magistrate Judge Pepe

## BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION TO FILE AMENDED COMPLAINT

    Plaintiffs seek amendment of the complaint for the reasons stated above. Pursuant to FRCP (15),

A party may amend the party's pleading once as a matter of course at any time before a responsive

pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has

not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is

served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of

the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response

5

to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Plaintiffs submit that Rule 15(a) of the Federal Rules of Civil Procedures directs that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); see also Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299, 306 (6th Cir. 2000). None of these factors exist here, as the delay in adding the new claim is not "undue", there is no bad faith on the part of the plaintiffs, no party can show it will suffer prejudice as a result of the motion, and the amendments are not futile.

WHEREFORE, the Plaintiffs' hereby pray this Court grant the Plaintiffs' motion to amend the complaint.

Dated: April 5, 2005

Respectfully Submitted,

**DAVID A. ROBINSON P38754**
*DAVID A. ROBINSON & ASSOCIATES, P.C.*
Attorneys for Plaintiffs
28145 Greenfield, Rd., Ste. 100
Southfield, Michigan 48076
(248) 423-7234

**BARRY C. SCHECK**
**NICK BRUSTIN**
**ARCHANA PRAKASH**
Cochran Neufeld & Scheck
Attorneys for Plaintiffs
99 Hudson St. 8th Fl.
New York, NY 10013
(212) 965-9081

6



RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

AVERY™

ORIGINAL

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In the Matter of the Estate of Eddie Joe Lloyd, Deceased by his
Duly Appointed Personal Representative, Ruth Harlin and
Tia Terese Glenn,

        Plaintiffs,

        v.

                                  Case No. 04-70922
                                  HON: Gerald E. Rosen
                                  Magistrate Judge Pepe

City of Detroit, a Municipal Corporation
County of Wayne, a Sub Unit of Government,
Officer Thomas DeGalan, Officer Sylvia Milliner,
Officer William Rice, Sergeant Kenneth Day,
Supervisor John Does, Detroit Psychiatric Institute,
Dr. Kyung Seok Han, Barbara Bacon, MSW,
Deputy Chief Richard Dungy, Gilbert R. Hill,
Former Officer in Charge of Homicide ,
Lieutenant Robert L. Deane

        Defendants,

---

## PLAINTIFFS' PROPOSED AMENDED COMPLAINT AND DEMAND FOR JURY

NOW COME the Plaintiffs, Ruth Harlin, in her representative capacity for the Estate of

Eddie Joe Lloyd, and Tia Terese Glenn, by and through their attorneys, Cochran, Neufeld &

Scheck, LLP, and Robinson & Associates, and say:

1.      This is a case about unconscionable deceptions.  Eddie Joe Lloyd was deceived by the

        defendant police officers into "confessing" to a crime he did not commit when he was a

        patient on pyschotropic medications in a mental institution.  The Wayne County

        Prosecutor's Office was deceived by the defendant police officers who knew they had fed

Mr. Lloyd details of the crime and who then falsely claimed that Mr. Lloyd had independent knowledge of these details. The jury and judge were deceived, by these police officers and the grossly inadequate defense provided to Mr. Lloyd at his trial, into sending an innocent man to prison for life. The family and friends of the victim, and the citizens of Detroit were deceived into believing that the right man was in prison for this horrific crime, while the real rapist and murderer was at large, free to commit more crimes. This lawsuit seeks to remedy these unconscionable deceptions.

2.  This is a case also about gross, inexcusable, and systemic indifference to a minimally competent and functioning criminal justice system. These officers deceived Mr. Lloyd to obtain a false "confession," and knew their deception would be permitted without any risk of exposure because the defense bar was so underfunded that only the least competent and indifferent attorneys would represent poor and despised clients such as Mr. Lloyd. Further, these deceptions were so convincing, that the trial court judge expressed his opinion that the "only justifiable sentence" would be "termination by extreme contrition" and Mr. Lloyd's own County appointed appellate lawyer wrote to the State of Michigan Attorney Grievance Commission that Mr. Lloyd's existence was "frivolous" and "should be terminated." An unspeakable tragedy was avoided only because Michigan did not permit the death penalty.

3.  Mr. Lloyd was imprisoned for seventeen years, three months and twenty-four days for a murder and rape that he did not commit. Mr. Lloyd was exonerated and released on August 26, 2002, based on DNA testing of semen evidence by both law enforcement and independent labs that conclusively excluded him as the rapist/murderer.

2

4.    Mr. Lloyd's conviction was the product of a coerced, fabricated confession which was unlawfully obtained and then concealed by defendant police officers, including Thomas DeGalan and the other defendant officers. These defendants fed Mr. Lloyd details about the crime, many of which only the perpetrator could know, and then reported that Mr. Lloyd had independent knowledge of this information, and had volunteered it. Further, in order to coerce, trick, and deceive Mr. Lloyd into adopting the details fed to him in confession form, Officer DeGalan encouraged and exploited Mr. Lloyd's delusional and mistaken belief that by "confessing" he would be helping to "smoke out" the real killer. Feeding Mr. Lloyd details of the crime and eliciting his "confession" based on Mr. Lloyd's delusional beliefs was all the more egregious, because at the time of his "confession," Mr. Lloyd was hospitalized after having been legally adjudicated mentally ill and a person requiring treatment under MCLA 330.1401 and 1472(a). Further, these detectives expressly knew and took advantage of Mr. Lloyd's delusional condition and his historical and grandiose attempts to help the police solve high profile crimes that had occurred in the City of Detroit. The true nature of Mr. Lloyd's confession was never disclosed to the prosecution or defense counsel and thus, also constitutes a violation of Lloyd's civil rights pursuant to Brady v. Maryland and its progeny.

5.    The unconstitutional and tortious acts of the individual defendant officers were not isolated incidents. Rather, these acts were consistent with a custom and practice of the Detroit Police Department of using coercive tactics against witnesses and suspects, fabricating evidence, failing to disclose exculpatory evidence, failing to properly investigate serious crimes, and failing to properly train and supervise officers in these critical law enforcement responsibilities. Further, these egregious acts remained hidden

3

from the jury, due, in part, to the County's longstanding policy and practice of grossly under funding defense counsel for indigent defendants and the related practice of appointing grossly incompetent defenders. Thus, beyond compensating Mr. Lloyd for the more than seventeen years stolen from him, and his continuing injuries, and beyond compensating his daughter for the loss of her father during her adolescence, this action seeks to redress the unlawful municipal and county customs, policies, patterns and practices pursuant to which defendants, acting under color of law both independently and in concert, violated Mr. Lloyd's clearly established rights as guaranteed by the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and The Rehabilitation Act and the laws of the State of Michigan.

6.      As a result of defendants' unconstitutional and tortious conduct, Mr. Lloyd was convicted on May 2, 1985, of first-degree murder and sentenced to mandatory life without parole. Mr. Lloyd seeks relief for the defendants' violation of his rights secured by the Civil Rights Act of 1871, 42 U.S.C. §1983, and of rights secured by the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and for rights secured under the laws of the State of Michigan. Further, Mr. Lloyd also seeks relief for the defendants' violation of his rights secured under The Rehabilitation Act, 29 U.S.C. § 794. Mr. Lloyd's daughter, plaintiff Tia Terese Glenn, seeks relief for the violation of her rights under the First and Fourteenth Amendments to the United States Constitution and under Michigan law. Plaintiffs seek damages, both compensatory and punitive, affirmative and equitable relief, an award of costs and attorneys fees, and such other and further relief as this court deems equitable and just.

4

## I. JURISDICTION

7.   The events or omissions giving rise to the claims hereunder occurred in the City of Detroit and County of Wayne wherein both the City and County are subject to personal jurisdiction of the Wayne County Circuit Court. The Estate of Eddie Joe Lloyd brings this action pursuant to MCLA 600.2922, the Wrongful Death Act.

8.   Plaintiffs filed the action in the Circuit Court of the Third Judicial Circuit of Michigan on March 4, 2004.

9.   The defendants removed this action to the United States District Court Eastern District of Michigan Southern Division pursuant to 28 U.S.C. §§ 1441(a), (b) and (c) on March 11, 2004.


## II. THE PARTIES

8.   Eddie Joe Lloyd is and was at all times material to this complaint, a resident of the State of Michigan. On September 22, 2004, he died wrongfully of medical complications incurred during his 17 long years of wrongful incarceration. During his incarceration Eddie Joe Lloyd developed serious health issues related to his heart, his vascular system and his mental and emotional well being. The medical and mental health treatment he received was woefully inadequate or non-existent. Before his death Eddie Joe Lloyd resided within the City of Detroit.

9.   Plaintiff, Ruth Harlin, surviving sister of Eddie Joe Lloyd, was appointed Personal Representative of his Estate on December 8, 2004. She is a resident of the State of Michigan.

5

10.     Plaintiff Tia Terese Glenn is and was at all times material to this complaint, a resident of the State of Michigan. She is Eddie Joe Lloyd's surviving daughter, and currently resides within the City of Detroit.

11.     Defendant City of Detroit (City) is a municipal corporation authorized under the laws of the State of Michigan.

12.     Defendant County of Wayne (County) is a sub unit of government authorized under the laws of the State of Michigan.

13.     Defendant Thomas DeGalan was at all time material to this complaint, a police officer employed by defendant City of Detroit. Upon information and belief, DeGalan has retired from the police force. He is named in his individual capacity.

14.     Defendant Sylvia Milliner was at all times material to this complaint, a police officer employed by defendant City of Detroit. She is named in her individual capacity.

15.     Defendant William Rice is and was at all times material to this complaint, a police officer employed by defendant City of Detroit. Upon information and belief, defendant Rice currently resides within the City of Detroit. He is named in his individual capacity.

16.     Defendant John Does, whose identities will be learned through discovery, were at all times material to this complaint, supervisors in the Detroit Police Department and employed by defendant City of Detroit. They are named in their individual capacities.

17.     Defendant Richard Dungy was at all times material to this complaint, the Deputy Chief of Police of Detroit and employed by the defendant City of Detroit. He is named in his official and individual capacity.

6

18.     Defendant Gilbert R. Hill was at all times material to this complaint, an Inspector and Supervisor in the Homicide Section of the Detroit Police Department, and employed by the defendant City of Detroit. He is named in his individual capacity.

19.     Defendant Lieutenant Robert L. Deane was at all times material to the complaint, a Lieutenant and Supervisor in the Homicide Section of the Detroit Police Department, and employed by the defendant City of Detroit. He is named in his individual capacity.

20.     Defendant Sergeant Kenneth Day was at all times material to this complaint, a sergeant in the Detroit Police Department and employed by Defendant City of Detroit. He is named in his individual capacity.

21.     Defendant Detroit Psychiatric Institute was at all times material to this complaint, a state psychiatric hospital housed in the City at Herman Keifer Hospital.

22.     Defendant Dr. Kyung Seok Han was at all times relevant to this complaint, a psychiatrist, and an employee and agent of Detroit Psychiatric Institute. He is named in his individual capacity.

23.     Defendant Barbara Bacon, was at all times relevant to this complaint, a social worker, and an employee and agent of the Detroit Psychiatric Institute. She is named in her individual capacity.

## III. FACTS

### The Murder of Michelle Jackson

24.     On January 25, 1984, the body of 16-year-old Michelle Jackson, the latest in a rash of fatal child abductions, the so-called "school-girl rapes" was discovered in an abandoned garage located in the City of Detroit, County of Wayne, State of Michigan. Miss Jackson

7

had been raped and strangled to death. She was left partially nude in an abandoned building after she was abducted early in the morning on January 24, 1984.

25.    Between September 1983 and February 1984, approximately 47 girls on their way to school were raped in the Detroit area. Ms. Jackson's rape instigated a city-wide outcry and demand for action and led to an intensive investigation and the formation of a special police task force to investigate her rape and murder.

26.    Miss Jackson had last been seen alive by a neighbor, who spotted her as she waited for her school bus on Fenkell Avenue at about five minutes past seven.

27.    When Miss Jackson did not return from school on the night of the 24th, her family contacted the police and filed a missing person report. The next morning, on the 25th, her family organized a search party, and canvassed the area around Miss Jackson's route to school.

28.    The family found Miss Jackson's body in an abandoned garage and contacted the police.

29.    From the beginning of this investigation, investigators uncovered a number of distinctive characteristics about the crime and the suspect. For example, Miss Jackson was found laying on her back, undressed from the waist down, except for one leg of her long underwear. The other leg of her long underwear was wrapped around her neck. Miss Jackson's coat, sweater and bra were still on, but they were pushed to the side as to expose her breasts. When Miss Jackson's body was moved by the evidence technicians at the scene, it was noted that a green "Ale 8" bottle had been inserted into her rectum. A witness also identified a man in a beige coat with a black skull cap around the scene when Miss Jackson was abducted.

8

30.    Officers from the Detroit Police Department Homicide Section, Squad Three, were assigned to the case. The lead officer on the case was Officer Thomas DeGalan.

31.    Upon information and belief, Sergeant Kenneth Day assisted and supervised the investigation by Officer DeGalan.

32.    After processing the scene, evidence of the perpetrator's semen was recovered from swabs of Miss Jackson's vagina, rectum, and on the bottle, her thermal underwear, and a piece of paper that was stuck to the bottle.

33.    A shoe imprint was also recovered from the scene, as were various fingerprints. None of the fingerprints were found to be usable. Outside the garage a pair of women's blue underwear were found hanging on a small tree.

34.    Due to the public outrage over Miss Jackson's death, Detroit Mayor Coleman A. Young hosted three "rape summits" in order to stop the school-girl rapes. The media extensively covered these rape summits and the actual rape of Michelle Jackson.

35.    Adding to the pressure the police department faced during this time, Detroit had the highest homicide rate in the country in 1984 and one of the lowest rates in the country of closing cases.

36.    Nine months after the rape and murder of Miss Jackson despite the rape summits, the special police task-force and the intensive investigation, the police had not identified any possible suspects in the case, had no leads as to who raped and murdered her, and had no information about the crime.

**Focusing on Eddie Joe Lloyd**

9

37.   On or about October 18, 1984, after obtaining no new information in the Jackson case, Officer Sylvia Milliner of the Sex Crimes Unit received a letter from Mr. Eddie Joe Lloyd, in which Mr. Lloyd stated he would like to assist the department in the investigation of Michelle Jackson's death. Mr. Lloyd's letter allegedly mentioned that he had some information about the death of Michelle Jackson. The letter stated that a bottle was found in the victim's vagina. In fact, the bottle had been found in the victim's rectum.

38.   Officer Milliner was familiar with Mr. Lloyd, as he had written between fifteen and seventeen letters to Officer Milliner, claiming in each that he had information on a crime and the identification of the perpetrator.

39.   Mr. Lloyd had also gone to see Officer Milliner in the past claiming he had evidence in cases and that he could help her solve them.

40.   Officer Milliner had never attempted to follow up on the "information" Mr. Lloyd claimed he had in past cases, nor did she forward the letters he wrote to other departments or officers investigating the crimes mentioned in the letters. Rather, she believed that Mr. Lloyd was somewhat of a "nuisance" who had no information about any of these crimes.

41.   On this occasion, however, Officer Milliner turned over this particular letter about the murder of Michelle Jackson to the officer in charge of the investigation, Officer DeGalan.

42.   At the time Mr. Lloyd wrote the letter to Officer Milliner he was involuntarily committed to the Detroit Psychiatric Institute, housed at Herman Kiefer Hospital.

10

43.    Mr. Lloyd had been hospitalized at the Detroit Psychiatric Institute on September 28, 1984, after he became agitated while waiting for benefits at a government agency.

44.    Based on a judicial finding that he was mentally ill, made by a probate judge during a hearing in which he was represented by counsel, Mr. Lloyd was ordered to remain at the Detroit Psychiatric Institute for observation for a period of up to sixty days.

45.    Dr. Kyung Seok Han, a psychiatrist at Detroit Psychiatric Institute, diagnosed Mr. Lloyd as suffering from bipolar affective disorder.  Mr. Lloyd exhibited symptoms such as: grandiosity, in which he believed that he had more power, money and information than others; and flight of idea, in which his thinking jumped from one subject to another. Additionally, Mr. Lloyd had "a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life."

46.    As a manifestation of his illness, Mr. Lloyd believed at this time that he was about to receive a large amount of money from the Detroit Police Department for his assistance in solving the "Oakland County Murders," a different series of high-profile child abductions and murders that remain unsolved to this day.

47.    Despite their knowledge of his hospitalization, diagnosis and history of offering unreliable "assistance" to the police in solving crimes, the defendant officers tracked Mr. Lloyd to the Detroit Psychiatric Institute, and interviewed him there on October 19, 1984.

**Fabricating the Confession**

48.    At the time of the October 19 interview, Mr. Lloyd was taking the drug Navene, which is antipsychotic drug with a tranquilizing effect.

11

49.    The interview on October 19 lasted for over two hours.

50.    After the October 19 interview, Mr. Lloyd was again interviewed by Officer DeGalan on
       October 23 and October 25 at the hospital. Neither of these interviews was taped.

51.    On or about October 23, Officer DeGalan spoke to Mr. Lloyd's social worker, Barbara
       Bacon, and/or DR. Kyung Seok Han, Mr. Lloyd's psychiatrist at the Detroit Psychiatric
       Institute, and asked that Mr. Lloyd be kept at the hospital, confined to the floor, and
       without any passes to leave the floor so that Officer DeGalan could continue
       investigating and questioning Mr. Lloyd. Upon information and belief, Dr. Han had
       concluded prior to this time that Mr. Lloyd should be afforded passes to leave the floor.
       Notwithstanding the fact that there was no psychiatric or medical reason to do so,
       defendants Han and Bacon kept Lloyd from leaving the unit.

52.    Upon information and belief, Officer DeGalan also had numerous phone contacts with
       Mr. Lloyd, none of which was taped.

53.    During these interviews, Mr. Lloyd repeated his obviously delusional and mistaken belief
       that his confession would help smoke out the real killer of Michelle Jackson. He
       repeatedly stated that he was confessing until the real killer came forth, that the real killer
       would confess on December 19, 1984, and that he would wait in county jail under a
       million dollars cash bond and that this would cause the real killer to come forth in
       December 1984.

54.    During these interviews, defendants fed Mr. Lloyd specific information about the crime,
       much of which only the police and perpetrator could have known. These details were
       given to Mr. Lloyd in order to make his confession credible and consistent with the
       evidence of the crime, as the police knew it.

                                           12

55. Officer DeGalan coerced, tricked, and deceived Mr. Lloyd into adopting these details, of which Mr. Lloyd had no independent knowledge, by exploiting Mr. Lloyd's delusional belief that by confessing he would help the police catch the real killer.

56. On October 26, Officer DeGalan again interviewed Mr. Lloyd but also brought Sergeant Rice with him. At this interview, Officer DeGalan wrote out a confession and had Mr. Lloyd sign it.

57. Officer DeGalan also tape-recorded Mr. Lloyd giving this confession. This was the first time DeGalan had taped any of the interviews with Mr. Lloyd, as it was the first time DeGalan knew that Mr. Lloyd had gotten the details to the confession straight.

58. Many specific details that the police knew from their investigation, then fed to Mr. Lloyd, and then coerced, tricked, and deceived him into adopting were found in his "confession," such as:

    a. The perpetrator abducted Miss Jackson on January 24, 1985 at about 7:00 a.m.

    b. The perpetrator abducted Miss Jackson while she was waiting for her school bus.

    c. The bus stop was located on Fenkell between Wildmere and Parkside.

    d. The perpetrator was wearing a beige coat and a black skull cap.

    e. The perpetrator left Miss Jackson in a single-door garage.

    f. Close to the garage there was a street light attached to a telephone pole.

    g. Miss Jackson was still wearing her jacket and sweater after she was raped and murdered.

    h. Her jacket was waist length.

    i. The perpetrator left Miss Jackson with her sweater and bra still on but pushed to the side so her breasts were exposed.

13

j.    The perpetrator used Miss Jackson's long johns to wrap them around her neck.

k.    The perpetrator used the long johns as a ligature to choke Miss Jackson.

l.    The perpetrator also choked her using his hands.

m.    The perpetrator ejaculated while raping Ms. Jackson.

n.    The perpetrator placed and left a bottle in Miss Jackson's rectum.

o.    The bottle was green.

p.    There was sperm on the bottle.

q.    A piece of paper had been stuck to the bottle.

r.    The bottle was a pop bottle.

s.    Miss Jackson had a pair of Gloria Vanderbilt jeans with her that morning, and they were not left at the scene.

t.    The missing Gloria Vanderbilt jeans had a bug design on the right rear pocket, and yellow stitching.

u.    Miss Jackson was wearing a pair of goldish shiny half-moon earrings, with a lined pattern resembling little circles on them.

v.    Miss Jackson's purse was left in the garage.

w.    Miss Jackson's purse contained photos in a plastic type container with pictures

x.    The content of her purse had been rifled through.

y.    The perpetrator was wearing shoes that left a pattern design on the ground.

z.    Miss Jackson's books were left scattered in the garage, including her homework book.

aa.   Miss Jackson's boots had been taken off and were found in the garage.

14

59.  Mr. Lloyd had no personal knowledge of these facts concerning the rape and murder of Miss Jackson and no physical evidence tied him to the crime.

60.  Defendant DeGalan wrote out the fabricated the "confession," and had Mr. Lloyd sign and repeat it. Mr. Lloyd's knowledge of the material facts of the crime contained in his "confession" were fabricated by Officer DeGalan, who was questioning Mr. Lloyd. To elicit his fabricated "confession," officers met with Mr. Lloyd at least four times to supply him details about the murder, and fueled Mr. Lloyd's delusional belief that he could help the police flush out the real killer in this crime.

61.  Officer DeGalan failed to disclose to the prosecutor and to defense counsel that he fed the facts of the crime to Mr. Lloyd, and that the confession written by the defendants was nothing more than the information defendants provided to Mr. Lloyd, and that they coerced Mr. Lloyd into adopting these facts, and that Mr. Lloyd did not have independent knowledge of these facts or volunteer any of them.

62.  In addition to misinforming the prosecutor about the true nature of the "confession," Officer DeGalan, in his capacity as a complaining witness, testified falsely at Mr. Lloyd's preliminary examination and criminal trial that Mr. Lloyd volunteered all of the information in the confession.

63.  Further, to bolster the weight of the fabricated confession, Degalan testified that he specifically searched all news sources to determine whether any of the facts Lloyd allegedly "volunteered" were made public, and that they had not.

64.  Despite the fact that Officer DeGalan knew the confession was coerced and fabricated and there was no other evidence linking Mr. Lloyd to the crime, the officers deliberately failed to investigate other leads or suspects.

15

65.   After this October 26 interview, Officer DeGalan again requested that Dr. Han, and/or Ms. Bacon of Detroit Psychiatric Institute keep Mr. Lloyd in their custody until Officer DeGalan could obtain a warrant for his arrest.

66.   At or about this time, Dr. Han believed that Mr. Lloyd no longer demonstrated signs of mental illness or psychosis and no longer satisfied the requirements for involuntary commitment.

67.   Based on Officer DeGalan's request, Detroit Psychiatric Institute, through the actions of Barbara Bacon and/or Hyung Seok Han, kept Mr. Lloyd confined to the floor without any legal or medical cause or justification until a warrant for his arrest was issued.


**Subsequent Proceedings**

68.   Based on Mr. Lloyd's false, fabricated and coerced "confession," defendant DeGalan obtained a search warrant to obtain samples of Mr. Lloyd's blood.

69.   To obtain the search warrant, Officer DeGalan stated that Mr. Lloyd had admitted to strangling, raping and sodomizing Miss Jackson, when in fact he knew that he had fabricated the false confession based on Mr. Lloyd's delusional and mistaken belief that by confessing he would help the police find the real killer.

70.   Officer DeGalan's misrepresentation that Mr. Lloyd had confessed was the only evidence that provided probable cause for the search warrant, and DeGalan intentionally and/or with reckless disregard for the truth made this misrepresentation.

71.   Although the lab results obtained by the defendants did not conclusively establish or exclude Mr. Lloyd as the perpetrator of this crime, no further testing was conducted or

16

requested by Mr. Lloyd's counsel to determine if Mr. Lloyd was in fact the perpetrator of the crime.

72. Based on his "confession," defendant officers, including Officers DeGalan and Rice obtained an arrest warrant by filling out an investigator's report, dated November 26, 1984, and signed by Officer DeGalan, Lieutenant Robert L. Deane and Inspector Gilbert R. Hill.

73. The only evidence linking Mr. Lloyd to the crime and establishing probable cause for the arrest warrant was the coerced, fabricated and false "confession."

74. The defendants knew this confession was false, and omitted this material information in order to establish probable cause for the arrest Mr. Lloyd. This omission was intentional and/or made with reckless disregard for the truth.

75. The arrest warrant was issued on December 7, 1984. Prior to that time, Officer DeGalan contacted Mr. Lloyd's parole officer and asked the officer to have Mr. Lloyd charged with violating his parole.

76. Before December 7, 1984, after being kept at Detroit Psychiatric Institute without cause, Mr. Lloyd was transferred to Jackson Prison based on his parole officer's report that he had violated his parole.

77. On December 7, 1984, an arrest warrant was issued for Mr. Lloyd, although he had been kept in custody, against his will, and without legal justification from October 23 until December 7.

78. Mr. Lloyd was picked up by Officer DeGalan and taken to his arraignment for the murder of Michelle Jackson.

79.   On January 18, 1985, Officer DeGalan and Officer Milliner testified at Mr. Lloyd's preliminary examination. The purpose of this hearing was to determine if there was probable cause to hold Mr. Lloyd for trial.

80.   At this hearing, Officer DeGalan again falsely testified that Mr. Lloyd had volunteered the information in his confession, and had independent knowledge of the information in his confession.

81.   The defendants knew this confession was false, and omitted this material information in order to establish probable cause for the arrest of Mr. Lloyd. This omission was intentional and/or made with reckless disregard for the truth.

82.   Probable cause was established based solely on Mr. Lloyd's "confession."

### The Trial

83.   Charles Lusby, and then Stanley Rubach were appointed as counsel to Mr. Lloyd.

84.   Pursuant to the policy, custom and practice of the County, these attorneys were provided $150 for all investigation activities, regardless of how much or how little investigation was actually conducted. Neither Mr. Lusby nor Mr. Rubach conducted any meaningful investigation in this capital case. Mr. Lusby retained an investigator, who was a law student, and had served three years for a manslaughter conviction. She never met with Mr. Lloyd, and conducted no meaningful investigation.

85.   Mr. Lusby did not hire or ask for any experts on forensics to help him analyze the blood, hair or fingernail scrapings from the crime, nor any of the forensic evidence. Upon information and belief, had Mr. Lusby conducted or requested more testing of the forensic evidence in this case, Mr. Lloyd could have been excluded as the perpetrator.

18

86.     Mr. Lusby did not hire an expert psychiatrist to evaluate Mr. Lloyd's condition at the time of his "confession," nor speak to one to determine the veracity and reliability of Mr. Lloyd's "confession" or to determine how his delusions could be exploited to create a "confession."

87.     Mr. Lloyd's trial was set for April 22, 1985. Mr. Lusby claimed he had fallen sick, and did not show up to court that day. No continuance was sought.

88.     On April 22, 1985, Mr. Stanley Rubach was appointed to represent Mr. Lloyd, and Mr. Lloyd's trial was reset for April 30, 1985. Mr. Rubach did not ask for more time to learn about or prepare a defense for Mr. Lloyd's capital murder trial.

89.     Mr. Rubach worked out of a bail bondsman's office near the courthouse.

90.     He, like Mr. Lusby, was well-known to the court and the county as an attorney who was willing to take capital cases and conduct little or no investigation, and provide little or no defense at trial.

91.     Again, like Mr. Lusby, Mr. Rubach did not hire or ask for any forensic experts to help him analyze the blood, hair or fingernail scrapings from the crime, nor did he request an expert psychiatrist to evaluate and explain Mr. Lloyd's condition at the time of the confession.

92.     During the trial, Mr. Rubach hardly cross-examined the witnesses, and did not cross-examine the medical examiner in this case at all. He did not call any defense witnesses. Nor did he offer more than a five minute closing during this first-degree murder case.

93.     Again, based solely on the erroneous fabricated "confession" obtained while Mr. Lloyd was on psychiatric medication and legally adjudged mentally ill, on May 2, 1985, Mr. Lloyd was convicted of first degree murder, M.C.L. § 750.316, after a jury trial.

19

94.     During Mr. Lloyd's sentencing hearing Judge Townsend stated that the "only justifiable sentence" would be "termination by extreme contrition." However, because Michigan did not permit the death penalty, Mr. Lloyd was sentenced to life in prison.

95.     After Mr. Lloyd's conviction, Judge Townsend appointed Robert E. Slameka as Mr. Lloyd's appellate attorney. Mr. Slameka has been reprimanded by the Attorney Discipline Board for misconduct in sixteen different cases, for both not communicating with clients or filing late legal briefs. He has also been suspended on one occasion, and had been ordered to type, not handwrite, letters to clients. He has also been ordered to attend a seminar on office management.

96.     Mr. Slameka never met with Mr. Lloyd, nor did he follow through with filing a vigorous challenge to Mr. Lloyd's conviction. In fact, Mr. Lloyd filed a Request for Investigation with the State of Michigan Attorney Grievance Commission complaining that Mr. Slameka had not contacted him nor kept him apprised of his appeal.

97.     Mr. Slameka responded to the inquiry with a handwritten note, stating that Mr. Lloyd's "claim of my wrongdoing is frivolous, just as his existence. Both should be terminated." (Attached as Exhibit 1).

98.     Mr. Slameka was reprimanded for failing to make contact with Mr. Lloyd and keep him informed about the status of his appeal.

99.     Mr. Lloyd's conviction was upheld and his Request for Review and Delayed Application for Leave to Appeal was denied on January 29, 1988. Plaintiff's subsequent Motion for Reconsideration, *writ of certiorari* in the United States Supreme Court and *Writ of Habeas Corpus* in the United States District Court of Michigan were also denied.

20

## Treatment in Prison

100. Mr. Lloyd was incarcerated in Michigan state correctional facilities from November 1, 1984 to August 26, 2002. Mr. Lloyd was incarcerated at maximum-security prisons throughout the State of Michigan, away from his daughter, Tia Glenn, who was in Detroit.

101. At the time of her father's conviction, Ms. Glenn was eleven years old.

102. Before Mr. Lloyd was convicted and sent to prison, he maintained a close relationship with Ms. Glenn.

103. As a result of his wrongful conviction and incarceration across the state, Ms. Glenn was unable to maintain a close personal relationship with Mr. Lloyd. When Ms. Glenn became an adult, she and her father communicated by writing on a regular basis. However, Ms. Glenn did not see her father from the time he was incarcerated until his release more than seventeen years later.

104. During his incarceration, Mr. Lloyd suffered from severe medical conditions, including an enlarged prostrate, arterial problems, and hepatitis C. He also underwent two surgeries for his conditions. These medical problems were caused by or exacerbated by his many years of wrongful incarceration.

## Exoneration

105. In 1995, after exhausting all avenues of appeal, Mr. Lloyd contacted the newly formed Innocence Project, claiming his innocence, and seeking assistance in obtaining and testing the biological evidence from the Jackson rape/murder.

106. The Innocence Project contacted the Wayne County Prosecutor's Office, who assisted the Innocence Project in conducting a search for the biological evidence in this case.

21

Eventually, numerous pieces of evidence, including the green Ale-8 bottle, the paper stuck to the bottle, the vaginal and anal swabs, and the victim's long johns were found through the joint efforts of both groups.

107.    Biological testing was done on the discovered evidence by both the Michigan Crime Lab and the independent lab, Forensic Science Associates, which is headed by Dr. Edward T. Blake.  Both labs concluded that the DNA on all four pieces of evidence matched each other and excluded Mr. Lloyd as the perpetrator of the crime.

108.    Based on these test results, and an investigation by the Wayne County Prosecutor's Office by Michael Duggan, Mike Cox, the Deputy Chief of Homicide in the Wayne County Prosecutor's Office, and Kevin Simowski, a Prosecutor in the Homicide Unit, it was established that Eddie Joe Lloyd was wrongfully convicted and that the real perpetrator was still at large.

109.    The Wayne County Prosecutor's Office, the Detroit Police Department, and Detroit Attorney Saul Green joined in the Innocence Project's motion to vacate Mr. Lloyd conviction on the basis of newly discovered evidence that demonstrated Mr. Lloyd's innocence.

110.    On August 26, 2002, after serving over seventeen years for the rape and murder of Michelle Jackson, which he did not commit, Mr. Lloyd was released from prison.

111.    On September 22, 2004, Eddie Joe Lloyd succumbed to death from arteriosclerotic heart disease with evidence of acute myocardial infarction. Just several weeks prior to his death he underwent surgery for placement of a cardiac pacemaker due to the compromised condition of his heart. Eddie Joe Lloyd's life expectancy and enjoyment of

22

life was severely shortened by his wrongful incarceration and the defendants bear significant responsibility for his ailing health.

### Systemic Misconduct in Detroit's Police Department

112.   Upon information and belief, there was a custom, policy, pattern and practice in the City of Detroit and the Detroit Police Department, by and through its final policymakers, beginning years before the unjust conviction of Mr. Lloyd and continuing into his incarceration, of condoning, encouraging, ratifying and acquiescing in the coercion of suspects and witnesses, the fabrication of evidence, and the failure to disclose exculpatory evidence and to adequately investigate serious crimes, such as the rape and murder of Michelle Jackson.

113.   An example of these blatantly unconstitutional customs, policies, patterns and practices, is that in murder investigations, police officers kept, as a matter of course, separate files containing exculpatory evidence, labeled "miscellaneous files," for the specific purpose of concealing exculpatory evidence from the prosecutors and the suspects.

114.   The City of Detroit, through its final policymakers, and the individual John Doe police supervisors, failed to adequately train, supervise, and/or discipline officers concerning proper investigatory techniques, evidence collection and evidence disclosure.

115.   Upon information and belief, the City of Detroit, through its final policymakers, and the individual John Doe police supervisors failed to adequately screen police officers in order to avoid hiring officers with a propensity for abusing their police authority.

116.   Upon information and belief, The City of Detroit, through its final policymakers, including, Mayor Coleman Archer and Police Chief William Archer hired political

23

cronies to fill top police department jobs, required officers to campaign on behalf the mayor in their jobs, and created an overall unprofessional culture where qualified officers left the police force in droves, and unqualified candidates were hired to replace them.

117.   Further evidence that unconstitutional customs and practices were widespread and tolerated in the department include that the Chief of Police, William Hart, a final policymaker for The City of Detroit, left office and ended his career in disgrace in 1991 when he was indicted and convicted of stealing over a million dollars from police funds.

118.   Based on the unconstitutional practices in the Detroit Police Department, including the use of coercion to obtain false confessions and the rounding up and arrest of witness to crimes, the City is currently supervised and monitored by the United States Department of Justice and under a consent decree to stop these unconstitutional practices.

**Systemic Misconduct by Wayne County and the Board of Commissioners**

119.   In 1985, the Recorder's Court, which has now been folded into the Wayne County Circuit Court, handled all felony and misdemeanor cases in Detroit.  Under Michigan Law in 1985, the Chief Judge of the Recorder's Court for the City of Detroit acts as Executive Chief Judge of the Recorder's Court and the Wayne County Circuit Court and is a final policymaker for the County.

120.   As the Executive Chief Judge, this person is responsible for setting the rates paid to attorneys representing indigent criminal defendants during trial and appeal.  Pursuant to Michigan Law, the rate should be set to provide "reasonable compensation for the services performed."  MI ST 775.16.

24

121. After representing an indigent criminal defendant, the attorney is paid by the Wayne County Board of Commissioners, in accordance with the rate set by the Executive Chief Judge.

122. In 1985, at the time of Mr. Lloyd's trial, compensation rates for capital cases during trial had been reduced to the same rate they had been in 1967. This included a mere $150 for the full preparation and investigation before a criminal trial, regardless of how much or how little time the attorney actually spent investigating the case. Compensation for appellate attorneys was set at $500.

123. Wayne County, by and through its final policymakers, maintained an unconstitutional custom, policy and practice of providing grossly inadequate rates for attorneys who represented indigent criminal defendants during trial and appeal, thereby assuring a system in which the least qualified attorneys would represent indigent defendants in capital cases. Pursuant to this policy, the County regularly appointed grossly incompetent and indifferent attorneys, such as Mr. Rubach, Mr. Lusby, and Mr. Slameka who provided little or no defense to their clients accused of capital offenses.

124. The defendant police officers knew of the County's unconstitutional custom, policy and practice of providing inadequate rates for attorneys, and knew that because of the this custom, policy and practice, their unconstitutional acts during the "investigation" of Mr. Lloyd would never be revealed at trial or on appeal.

125. These low rates resulted in constitutionally inadequate representation of indigent defendants during trial and appeal, and despite their actual and constructive knowledge of the ineffective assistance of counsel defendants were receiving, the Executive Chief

25

Judge of the Recorder's Court and the Wayne County Circuit Court and the County

Board of Commissioners did nothing to ameliorate these conditions.

## IV.  CLAIMS FOR RELIEF

### 42 U.S.C. § 1983: Fourteenth Amendment Due Process and Fair Trial Right Violations Fabrication of Evidence; Coercion; Failure to Disclose Exculpatory Material to the Prosecution; Failure to Investigate Against Defendant Police Officers

126.   Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

### Fabrication of "Confession"

127.   Defendant police officers, including Officer DeGalan, deliberately, and with reckless

disregard for the truth, fabricated evidence by supplying Mr. Lloyd with specific details

of the crime and then representing to the prosecutors in the search warrant, the arrest

warrant, and during the preliminary examination and at trial that Mr. Lloyd had

independent knowledge of these details, and that Mr. Lloyd volunteered these facts.

128.   This fabricated evidence was used to establish probable cause for the arrest of Mr. Lloyd,

was used to make the decision to try Mr. Lloyd and was used at trial to convict Mr.

Lloyd.  This fabrication, that Mr. Lloyd was independently aware of the details of Miss

Jackson's death and volunteered them to the police, was the only evidence linking Mr.

Lloyd to the death of Miss Jackson.

129.   Deliberate fabrication of false evidence used against a criminal defendant violated clearly

established constitutional law of which all reasonable officers would have known.

26

## **Failure to Disclose Exculpatory/Impeachment Evidence**

130. Defendant police officers, including Officers DeGalan, deliberately failed to document and disclose to the prosecutors material exculpatory and impeachment information.

131. Defendant police officers did not tell prosecutors, nor did they include in their affidavits for the search warrant or arrest warrant, that they fed Mr. Lloyd details of the crime, exploited his delusional beliefs, and that they then falsely claimed he had volunteered this information, demonstrating that he had independent knowledge only the perpetrator or police would now.

132. By failing to disclose this information, defendants violated the Fourteenth Amendment, as interpreted by Brady v. Maryland, 373 U.S. 83 (1963), and its pre-1984 progeny, which imposed a clear duty on the defendants not to conceal exculpatory evidence, and rather to report all material exculpatory and impeachment information to prosecutors.

133. Defendants' bad-faith, intentional and/or reckless failure to disclose this material exculpatory information to the prosecutors deprived Mr. Lloyd of significant exculpatory and impeachment material that would have completely eviscerated the incriminating value of his "confession."

134. Defendants knew or acted with reckless disregard to the fact that due to his psychiatric condition, and defendants' manipulation and coercion, Mr. Lloyd was not aware of this material exculpatory evidence and therefore could not have discovered it through diligence unless otherwise disclosed to the prosecution or his defense attorneys.

135. Withholding material exculpatory evidence violated clearly established constitutional law of which all reasonable officers would have known.

**Coercion**

136.    Defendants, including Officer DeGalan coerced, tricked and deceived Mr. Lloyd into adopting the facts that he had been given into a confession by taking advantage of Mr. Lloyd's psychiatric condition, including his delusional belief that he was in partnership with the police and that by confessing he was helping them smoke out the real killer.

137.    Because of the defendants coercion, trickery and deceit, Mr. Lloyd's will was overborne and his confession compelled.

138.    DeGalan's coercion compelled Mr. Lloyd to make false inculpatory statements that were used against him in securing the search warrant, the arrest warrant affidavit, during the preliminary examination hearing and at trial.

139.    Coercing a witness or suspect into giving false information violated clearly established constitutional law of which all reasonable officers would have known.

**Failure to Investigate**

140.    Defendants deliberately, recklessly or with deliberate indifference failed to investigate leads that would have corroborated Mr. Lloyd's innocence and led to the real perpetrator, violating Mr. Lloyd's clearly established Fourteenth Amendment right to due process of law.

141.    Defendants knew or should have known Mr. Lloyd was not the perpetrator of this crime, and knew that there was no probable cause to believe that Mr. Lloyd was the perpetrator of the crime, as they fabricated, and coerced all the evidence connecting Mr. Lloyd to

28

the crime. Defendants chose to continue presenting this false evidence and unlawfully gain the conviction of Mr. Lloyd, instead of adequately investigating the rape and murder of Miss Jackson.

142. Defendants' intentional, reckless and bad-faith misconduct in fabricating evidence against Mr. Lloyd, suppressing exculpatory evidence, coercing his confession, and failing to adequately investigate the crime deprived Mr. Lloyd of his right to a fair trial, caused Mr. Lloyd's conviction, and caused him to serve over seventeen years of incarceration for a crime he did not commit, and to suffer the additional physical, emotional and pecuniary damages as described below.

### 42 U.S.C. § 1983: Fifth and Fourteenth Amendment Violations:
### Fifth Amendment Right to be Free from Compelled Self-Incrimination, and Fifth and Fourteenth Amendment Right to be free from Coercive Police Conduct that Shocks the Conscience Against Defendant Police Officers

143. Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

144. Although defendants, including Officer DeGalan knew or should have known that Mr. Lloyd was not involved in the murder of Miss Jackson, he fed him facts about the crime and falsely attributed the knowledge of these facts to Mr. Lloyd, and played on Mr. Lloyd's mental illness in order to coerce, trick and deceive him into a confession and obtain a conviction of Mr. Lloyd. These coercive and egregious acts violate Mr. Lloyd's clearly established Fifth Amendment right to be free from compelled self-incrimination, and shock the conscience and violate Mr. Lloyd's clearly established Fourteenth Amendment substantive due process right.

29

145.   Officer DeGalan coerced, tricked and deceived Mr. Lloyd into adopting the facts that he
had given him into a confession by taking advantage of Mr. Lloyd's delusional belief that
he was in partnership with the police and that by confessing he was helping them smoke
out the real killer.

146.   Because of Officer DeGalan's coercion, trickery and deceit, Mr. Lloyd's will was
overborne and his confession compelled.

147.   DeGalan's coercion compelled Mr. Lloyd to make false inculpatory statements that were
used against him in securing the search warrant, the arrest warrant affidavit, during the
preliminary examination hearing and at trial.

148.   Although defendant knew or should have known that Mr. Lloyd's history of mental
illness, involuntary commitment to a county hospital, and medication caused him to be at
a great risk to falsely confess to a crime he did not commit, they deliberately ignored this
risk when fabricating and coercing Mr. Lloyd to confess to a crime.  This deliberate
indifference to the risk of obtaining and creating a false confession, shocks the
conscience, and violated Mr. Lloyd's clearly established right to substantive due process
as guaranteed by the Fourteenth Amendment.

149.   Defendants' intentional, reckless and bad-faith misconduct in coercing, tricking and
deceiving Mr. Lloyd to make inculpatory statements and falsely confess to a crime he did
not commit deprived Mr. Lloyd of his right to be free from coerced self-incrimination,
caused Mr. Lloyd's conviction, and caused him to serve over seventeen years of
incarceration for a crime he did not commit, and to suffer the additional physical,
emotional and pecuniary damages described below.

30

**42 U.S.C. § 1983 Fourth and Fourteenth Amendment Violations:**
**False Arrest, False Imprisonment, Deliberate Fabrication and Material Omissions in the**
**Arrest Warrant Affidavit (Franks v. Delaware Claim), and Malicious Prosecution**
**Against Defendant Police Officers, and Detroit Psychiatric Institute and Han AND Bacon**

150. Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

151. No medical or legal justification existed for keeping Mr. Lloyd in custody at Detroit

Psychiatric Institute from the end of October 1984, when Dr. Han believed Mr. Lloyd to

be ready for release, until December 7, 1984, when an arrest warrant was issued for his

arrest.

152. Mr. Lloyd was kept at the Detroit Psychiatric Institute due to Officer Degalan's request,

and based on the fabricated, coerced and false "confession" elicited by Officer Degalan.

Officer Degalan, Dr. Han and Ms. Bacon caused Mr. Lloyd to remain in custody without

probable cause and without an arrest warrant.

153. The fabricated, coerced and false "confession" of Mr. Lloyd did not provide probable

cause to believe Mr. Lloyd was involved in the rape and murder of Michelle Jackson.

154. The defendants knew that the "confession" was fabricated and coerced and obtained only

because Mr. Lloyd thought he was going to help smoke out the real killer, and because

they fed him the details of the crime they knew.

155. No other evidence giving rise to probable cause existed, and in fact, Mr. Lloyd was

innocent of any crime against Michelle Jackson.

156. Defendant police offices, including DeGalan deliberately, with malice and reckless

disregard for the truth, caused an arrest warrant to issue by filing an affidavit containing

31

fabricated evidence and omitting material information that would have vitiated probable cause.

157. No warrant would have issued for the arrest of Mr. Lloyd if defendants had not falsified the affidavit, or if they had included the material information about their own misconduct and Mr. Lloyd's lack of knowledge of the crime.

158. Based upon the fraudulently obtained arrest warrant, defendants arrested Mr. Lloyd for a crime he did not commit, and caused a prosecution to commence against him by charging him with murder.

159. After Mr. Lloyd's arrest, Officer DeGalan falsely testified at Mr. Lloyd's preliminary examination hearing, omitted material information about Mr. Lloyd's "confession" and with malice and reckless disregard for the truth testified that Mr. Lloyd had confessed to this heinous crime.

160. No probable cause would have been found to hold Mr. Lloyd for trial if DeGalan had not testified falsely, or if they had included the material information about their own misconduct and Mr. Lloyd's lack of knowledge of the crime.

161. Based upon the fabricated probable cause, defendants held Mr. Lloyd for a crime he did not commit, and caused the prosecution to continue against him for murder.

162. Officer DeGalan acted to secure Plaintiff's conviction despite the evidence. He chose to ignore, disclose, or misrepresent the evidence that indicated Plaintiff's innocence. Defendant tendered information they knew, or should have known to be false and failed to disclose material exculpatory evidence, including the true nature of Mr. Lloyd's

32

"confession" which misled the prosecutor to believe he had probable cause and influenced the decision to prosecute.

163. The criminal action ultimately terminated in Plaintiff's favor, when his conviction was vacated on the grounds of his actual innocence, due to conclusive comparative DNA testing, which excluded Mr. Lloyd as the perpetrator.

164. Defendants' acts in falsifying the arrest warrant affidavit, arresting Mr. Lloyd and commencing, initiating, procuring and/or causing his prosecution were committed with malice and deprived him of his liberty without probable cause or due process of law for seventeen years, in violation of his clearly established rights under the Fourth and Fourteenth Amendments, and caused him to sustain injuries and damages as described below.

### 42 U.S.C. § 1983: Fourteenth Amendment Violation: Procedural Due Process Claim against Defendant Police Officers, Han, Bacon and Detroit Psychiatric Institute

165. Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

166. Mr. Lloyd had a liberty interest in obtaining his release from his involuntary commitment at Detroit Psychiatric Institute in accordance with the provisions of Michigan's mental health laws.

167. Mr. Lloyd had a liberty interest in obtaining release from his involuntary commitment once he no longer met the requirements for commitment under MCLA 330.1401 and 1472(a) for a "person requiring treatment."

33

168.   Acting under color of state law, defendants Han, Bacon and DeGalan interfered with and
       denied Mr. Lloyd's liberty interest in obtaining his release from Detroit Psychiatric
       Institute once there was no medical reason to keep him committed and in doing so,
       violated his right to due process under law.

169.   As a result of this violation, Mr. Lloyd was involuntarily kept in Detroit Psychiatric
       Institute without cause, justification, or legal authority, and without proper process from
       about the end of October 1984, when defendant Han determined that Mr. Lloyd was
       eligible for release, until December 7, 1984.

170.   As a result, Plaintiff suffered the injuries set forth below.


**Fourteenth Amendment Substantive Due Process Claim against Detroit Psychiatric
Institute, Han and Bacon**

171.   Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

172.   Mr. Lloyd was involuntarily committed to the Detroit Psychiatric Institute.

173.   Upon his involuntary commitment, Mr. Lloyd became a ward of the state, and the state,
       through Dr. Han and Ms. Bacon owed him a duty to protect him and provide adequate
       medical and psychiatric care.

174.   Defendants breached this duty by failing to protect Mr. Lloyd from police interrogation
       when Mr. Lloyd was in a delusional state, on pyschotropic medications and vulnerable to
       manipulative tactics such as those used by the Detroit Police Department.

34

175. Defendant Han and Bacon's conduct in allowing the police to speak with Mr. Lloyd in spite of his psychological problems was an abuse of governmental authority unjustified by any legitimate medical or psychological ends.

176. Their conduct shocks the conscience, in that it was deliberately indifferent to Mr. Lloyd's constitutional right to liberty and was a substantial departure from accepted professional judgment, practice, or standards.

177. As a result, Plaintiff suffered the injuries set forth below.


## 29 U.S.C. § 794 - The Rehabilitation Act Against City of Detroit and Detroit Psychiatric Institute

178. Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

179.  Mr. Lloyd was a qualified individual as defined by the Rehabilitation Act.

180. The City of Detroit is an entity receiving federal funds as defined by the Rehabilitation Act.

181. The Detroit Psychiatric Institute is an entity receiving federal funds as defined by the Rehabilitation Act.

182. Defendant DeGalan coerced and fabricated a confession from Mr. Lloyd during a time when he was hospitalized after having been legally adjudicated mentally ill and a person requiring treatment under MCLA 330.1401 and 1472(a). The false "confession" was literally obtained while Mr. Lloyd was detained under court order and receiving mental health treatment at Herman Keifer Psychiatric Institute located in Detroit, Michigan.

35

183. The police defendants expressly knew of the Plaintiff's delusional condition and of his historical and grandiose attempts to help the police solve high profile crimes that had occurred in the City of Detroit.

184. City of Detroit, through the defendants, failed to accommodate and, rather, exploited Mr. Lloyd's disability when they kept him falsely imprisoned in a psychiatric hospital and fed him facts about the crime and falsely attributed them to him, and played on his mental illness in order to obtain a confession and conviction of Mr. Lloyd.

185. The City of Detroit discriminated against Mr. Lloyd by failing to accommodate his mental disability when it failed to regulate, train, and otherwise supervise its employees to properly accommodate the disabilities of mentally ill witnesses and suspects in conducting interrogations and other law enforcement activities.

186. When Mr. Lloyd was fed facts about the crime and then coerced into "falsely" confessing, he was being treated at Detroit Psychiatric Institute, by defendants Han and Bacon.

187. Although both Dr. Han and defendant Bacon knew of Mr. Lloyd's delusional condition and of his historical and grandiose attempts to help the police solve high profile crimes that had occurred in the City of Detroit, knew he was medicated and involuntary committed, they failed to protect him from or monitor his contact with the police defendants. Han and Bacon also kept Mr. Lloyd committed without justification at the behest of the police defendants after any legal or medical justification for his continued confinement ended.

36

188.   Detroit Psychiatric Institute discriminated against Mr. Lloyd by failing to accommodate his mental disability when it failed to regulate, train, and otherwise supervise its employees to properly accommodate the disabilities of mentally ill and vulnerable patients who were potential witnesses in a crime, and who were being questioned by the police.

189.   As a result, Plaintiff suffered the injuries set forth below.

### 42 U.S.C. § 1983
### Supervisory Liability

190.   Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege: Defendant supervisors, including William Rice, Kenneth Day, Richard Dungy, Gilbert Hill, Robert L. Deane, and other John Does were at the relevant times, supervisory personnel at the Detroit Police Department, with oversight responsibility for Officer DeGalan and other defendant police officers, who obtaining the coerced and fabricated confession from Mr. Lloyd.  They were responsible for the hiring, training, instruction, supervision, and discipline of the officers who coerced and fabricated the "confession" from Mr. Lloyd.

191.   By reason of the foregoing, these defendants acted with reckless disregard and deliberate indifference in the supervision, hiring, training, and discipline of the individual and officers thereby causing the wrongful conviction of Mr. Lloyd.

192.   As a direct and proximate result of said violations, Mr. Lloyd was wrongfully convicted, and suffered the damages described above.

37

**42 U.S.C. § 1983**
***Monell* Claim Against Defendant City for Unconstitutional Custom, Practice and Policy**

193.    Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

194.    At the time of the conduct complained of herein the City, through its policymakers had in
force and effect a policy, practice and custom of coercing witnesses and suspects into
false confessions; failing to investigate crimes adequately, fabricating evidence in
investigations, and failing to disclose exculpatory and impeachment evidence.

195.    The final policymakers of the City of Detroit had actual or constructive knowledge of
these unconstitutional practices yet failed to take any reasonable or adequate steps to
remedy them.

196.    These policies, customs, and practices led Detroit police officers to believe that
misconduct would be tolerated and that allegations of abuse of constitutional rights
would not be investigated.  This pattern made it foreseeable that officers would violate
people's constitutional rights in precisely the manner Mr. Lloyd's rights were violated,
and the City, through its final policymakers were deliberately indifferent to this risk.

197.    These policies, customs, and practices of the Detroit Police Department as described in
this complaint, were the moving force behind Plaintiff's false arrest, malicious
prosecution, unconstitutional trial and wrongful incarceration.

198.    As a result, Plaintiff suffered the injuries set forth below.


***Monell* Claim Against Defendant City for Unconstitutional Discipline, Training and
Supervision of Police Officers**

199.    Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

38

200.  At the time of the complained of incident, Defendant City had a policy, custom, or practice of failing to properly discipline, supervise, and train Detroit police officers including the individual Defendants in this case in the proper way to conduct investigations, interview witnesses and suspects, and disclose Brady materials. The City failed to ensure that its police officers would conduct constitutionally adequate investigations; refrain from unconstitutional interrogation techniques; obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants; follow the duties imposed by *Brady v. Maryland*; and never fabricate inculpatory evidence.

201.  The final policymakers of the City of Detroit had actual or constructive knowledge of these unconstitutional practices yet failed to take any reasonable or adequate steps to remedy them.

202.  These policies, customs, and practices led Detroit police officers to believe that misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated. This pattern made it foreseeable that officers would violate people's constitutional rights, in precisely the manner Mr. Lloyd's rights were violated, and the City, through its final policymakers, was deliberately indifferent to this risk.

203.  These policies, customs, and practices of the Detroit Police Department as described in this complaint, were the moving force behind Mr. Lloyd's false arrest, malicious prosecution, unconstitutional trial, and wrongful incarceration.

204.  As a result, Plaintiff suffered the injuries set forth below.

39

**42 U.S.C. § 1983 – Monell Claim against Wayne County and the Wayne County Board of Commissioners for Unconstitutional Policy, Practice and Custom**

205.   Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

206.   Mr. Lloyd's Sixth Amendment Right to counsel during his trial and appeal, and Fourteenth Amendment right to a fair trial were violated by the ineffective representation afforded to him before and during his trial, and during his appeal.  The ineffective assistance of counsel that Mr. Lloyd received was a cause of his unconstitutional trial, wrongful and unjust conviction.

207.   At the time of the trial, Wayne County, through its final policymakers, had in force and effect a policy, practice, pattern and/or custom of providing grossly inadequate compensation to attorney's representing indigent criminal defendants in capital cases during trial and appeal and a related policy, practice and/or custom of appointing grossly incompetent defense attorneys to represent indigent defendants.

208.   The final policymakers of Wayne County, including without limitation, The Executive Chief Judge and the Board of Commissioners, had actual or constructive knowledge of these unconstitutional practices yet failed to take any reasonable or adequate steps to remedy it.

209.   This policy, custom, pattern and practice ensured that indigent criminal defendants received grossly inadequate assistance of counsel during their cases.  This pattern made it foreseeable that Mr. Lloyd's rights would be violated in precisely the manner in which they were violated.  The County, through its final policymakers, knew of this risk, and were deliberately indifferent to it.

40

210.    This policy, custom, pattern and practice of Wayne County and the Board of

Commissioners, as described in this complaint, was the moving force behind the

violation of Mr. Lloyd's right to the effective assistance of counsel and a constitutionally

adequate trial.

211.    As a result, Plaintiff suffered the injuries set forth below.


### 42 U.S.C. § 1983 Conspiracy Against Officers DeGalan, Rice, Milliner and Day, and defendants Han and Bacon

212.    Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

213.    The individual defendants, acting in their individual capacities and under color of state

law reached a plan, agreement or understanding to unlawfully and unconstitutionally

deprive Mr. Lloyd of his civil rights.

214.    In furtherance of this conspiracy, the defendants, among other things:

      a.      Caused Mr. Lloyd to remain involuntary committed to Detroit Psychiatric

Institute after he was fit to be released but before an arrest warrant had been

issued for his arrest;

      b.      Fabricated evidence by supplying Mr. Lloyd with details of the crime and then

representing to the prosecutors, the court, and the jury, in the search warrant, the

arrest warrant, during the preliminary hearing and at trial that Mr. Lloyd had

independent knowledge of these details, and that Mr. Lloyd volunteered these

facts;

41

    c.      Failed to document and disclose to the prosecutors material exculpatory and impeachment information about the true nature of Mr. Lloyd's "confession"

    d.      Took advantage of Mr. Lloyd's delusional belief that he was in partnership with the police and that by confessing he was helping them smoke out the real killer in order to coerce, trick and deceive Mr. Lloyd into adopting the facts that he had been given into a confession.

215.    The Defendants' conspiracy caused the constitutional deprivations suffered by Mr. Lloyd, including his false arrest, illegal confinement, malicious prosecution and wrongful conviction.

216.    As a result, Plaintiff suffered the injuries set forth below.

### 42 U.S.C. § 1983 Pendent Claims Family Association Claims against Officers Degalan and Rice and defendants Han and Bacon

217.    Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

218.    Defendants' conduct undermined Tia Terese Glenn's First and Fourteenth Amendment and recognized familial economic and social interest under state common law for a minor in her relationship to her father and interest in preserving the integrity and stability of the parental relationship from intervention by the state without due process of law.

### Michigan False Arrest & False Imprisonment Claims against Defendant Police Officers Rice and DeGalan and Wayne County Employees Dr. Han and Barbara Bacon

219.    Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

220.    Plaintiff was intentionally arrested and intentionally imprisoned by Defendants.

221.   Plaintiff was aware of his arrest and imprisonment and both were against his will.

222.   Plaintiff was restrained, detained, and confined and thereby deprived of his personal
       liberty and freedom of movement.

223.   Plaintiff's false arrest and imprisonment was accomplished by actual physical force or by
       an express of implied threat of force.

224.   Plaintiff's arrest and imprisonment were unlawful as they lacked probable cause as
       described in detail above.

225.   As a result, Plaintiff suffered the injuries set forth below.


**Michigan Malicious Prosecution Claim against Defendant Police Officers Rice, DeGalan
and Milliner**

226.   Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege:

227.   Defendants commenced, or caused to be commenced, a criminal prosecution, instituted
       with malice and without probable cause against Plaintiff.

228.   The criminal action ultimately terminated in Plaintiff's favor, when his conviction was
       vacated on the grounds of his actual innocence, due to conclusive comparative DNA
       exoneration.

229.   The prosecution was instituted and continued with a primary purpose other than that of
       bringing the offender to justice.

230.   As a result, Plaintiff suffered the injuries set forth below.

**Michigan Intentional Infliction of Emotional Distress Claim against Defendant Police
Officers Rice and DeGalan**

231.   Plaintiffs incorporate fully all of the foregoing as if set forth herein and further allege: